## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **CASSANDRA BARLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-CV-0240-CVE-PJC** |
| | ) | |
| **WAL-MART STORES EAST, LP,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motion Summary [sic] Judgment and Supporting Brief (Dkt. # 35) filed by Wal-Mart Stores East, LP ("Wal-Mart"). In her amended complaint, plaintiff Cassandra Barley ("Barley") alleges sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq. ("Title VII"). Wal-Mart argues that summary judgment should be granted pursuant to Fed. R. Civ. P. 56 on the ground that no genuine issues of material fact exist. For the reasons set forth below, the Court finds that Wal-Mart's motion should be **granted**.

### I.

Wal-Mart hired Barley in November 2003 as a sales associate in the deli department. Dkt. # 44, at 5. Wal-Mart maintained at all times relevant to this case three employment policies about which Barley knew. See id. at 6-7. First, Wal-Mart had a policy prohibiting discrimination, harassment, and lack of respect for others. Id. at 6. The policy required employees to report such prohibited behavior to a supervisor immediately. Id. Employees also could use Wal-Mart's toll free

phone number to make a report.  Id.  Second, Wal-Mart had a formal "Open Door Policy" through which associates could address work-related grievances.  Id.

Third, Wal-Mart maintained a "Coaching for Improvement" disciplinary policy.  Id. at 7. Under this policy, if an employee failed to meet employment expectations or violated company policy, she might receive one of three reprimands or, depending on the nature of the incident, be subject to immediate termination.  Id.  The first step of the coaching process typically was a verbal reprimand.  Id.  The second step typically was a written reprimand.  Id.  The third step was a "Decision-Making Day" reprimand, the final step in the disciplinary process, after which a subsequent infraction would result in the associate's termination.  Id.  Wal-Mart had discretion to bypass one or more of these steps if the circumstances so required.  Id.

In December 2004, Barley took a leave of absence from her employment.  Id. at 8.  She returned to work on April 5, 2005.  Id.  Upon her return, Barley had three supervisors:  Kirk Robertson ("Robertson"), who was the lead deli associate, Alan Stewart ("Stewart"), who was the assistant manager over the deli and fresh meat and produce areas, and Dacona Smith ("Smith"), who was the facility manager of the Wal-Mart store.  Id. at 5.  Sometime around May 30, 2005, Barley reported to Robertson that a fellow deli associate, Byron "Chris" Watson ("Watson"), had made comments of a sexual nature to her.  Id. at 6, 8.  Barley did not describe specifically Watson's comments because she claims Robertson did not ask.  Id. at 8.  Robertson stated that he would relay Barley's grievance to the assistant manager, Stewart.  Id.

Upon learning of Watson's alleged behavior, Stewart met with Barley and asked her what Watson had done.  Id.  Barley claims that she told Stewart that Watson had joked and had commented about her sexual preference and had asked her if she wanted to engage in sexual

relations with him and another deli co-worker, Carley Dawes ("Dawes").  Id.  Dawes was a close friend of Barley.  Id.  Barley also claims that she told Stewart that Watson repeatedly expressed his sexual desire for her and looked at her sexually each time he saw her at work.  Id.  Stewart stated that he would report the matter to the facility manager, Smith.  Id. at 9.

After speaking with Barley, Stewart took statements from Watson and Dawes.  Id.  Based on the statement he received from Dawes, Stewart also took statements from two other associates, Versall Henderson ("Henderson"), who worked in the deli department, and LaMarcus Jackson, who worked in the meat department.[1]  Id.  In Dawes' statement, she wrote that Barley told her three months earlier about Watson's threesome proposition.  Id.  Dawes claimed that Watson had recently asked her if she had heard the threesome rumor "going around the deli."  Id.  Dawes stated that Watson told her that he had been asked whether the threesome rumor was true.  Id.  In Watson's statement, he wrote that a co-worker told him about the threesome rumor.  Id.  Watson claimed that he asked Dawes about the rumor in an effort to find its source.  Id.  Watson denied making any sexual comments to Barley.  Id.  Based on these preliminary findings, Stewart elected to separate Watson and Barley until resolution of the matter.  Id.  Watson was reassigned to a different part of the store.  Id. at 9-10.  Notwithstanding this reassignment, Watson allegedly continued to make sexually inappropriate comments to Barley until her termination on June 7, 2005.  Id. at 10.

Stewart gave the handwritten statements obtained during his investigation to Smith.  Id. at 9.  Smith then opened a formal "Redbook" investigation, which occurs when an associate reports alleged misconduct, discrimination, or harassment.  Id. at 10.  With the assistance of Stewart, Smith

---

[1]     Dawes described Henderson's alleged inappropriate sexual conduct toward Jackson.  Id. Jackson confirmed these allegations, but Henderson denied them as untrue.  Id.

3

interviewed eight associates believed to be knowledgeable about the matter.  Id.  Smith interviewed

these eight individuals, including Barley, Dawes, and Watson, between June 2, 2005 and June 7,

2005.  Id. at 17-18.  Smith did not interview every deli associate during his investigation, however.

Id. at 18.  Smith testified that he did not interview the lead deli associate, Robertson, and another

deli associate (identified by Barley, Dawes, and another associate as having knowledge about the

threesome rumor) because either: (i) the individual's name did not arise during the course of the

investigation; or (ii) Smith did not feel as though the individual had substantive information to offer.

Dkt. # 44-13, Exhibit 13, at 57-58; Dkt. # 44-14, Exhibit 14, at 71.

Smith asked the eight interviewees to complete "Associate Statement" forms.  The forms

instructed the associates to write everything they knew about the alleged workplace misconduct.

Dkt. # 44, at 9.  The forms further instructed,

> Just write out what happened.  If there was more than one incident, describe them in
> the order they occurred . . . .  For each incident you describe, be sure to explain when
> the incident happened, where it happened, what happened, who did and said what,
> and who was present . . . .  Be especially sure to write down exactly what people said
> and did . . . .  This is important, so we need you to take your time and write
> everything you know.

Dkt. # 35, Exhibit 12, at 79.

In her Associate Statement, Barley described Watson's alleged threesome inquiry.  Dkt. #

44, at 10.  Barley wrote that Watson "was liking [her]" before the threesome proposition, which she

said occurred about three months prior to the filing of her grievance.  Id. at 11.  Barley described

how Watson stopped talking to her for a period of time but then resumed interaction.  Id.  Barley

further described how the threesome rumor had been circulating among her co-workers, and how

she had asked these associates to leave her name out of this gossip.  Id. at 11.  Barley did not,

however, write down the allegations that she claims she verbally told Stewart.  <u>See</u> Dkt. # 44-19, Exhibit 19.

As to Watson's and Dawes' Associate Statements, Watson denied Barley's allegations.  Dkt. # 44, at 12.  Watson claimed instead that Barley had engaged in inappropriate conduct toward him. <u>Id.</u> at 12-13.  He wrote that other associates had warned him that he should be cautious of Barley.[2] <u>Id.</u> at 13.  He alleged that Barley was upset with him because he had recently married and would no longer talk to her.  <u>Id.</u>  Dawes' Associate Statement reiterated her earlier statements to Stewart.  <u>Id.</u>

After Barley's June 5, 2005 interview with Smith, she claims that "Watson continued making comments," including that "he still wanted [her]" and inquiring as to why she had filed a grievance. Dkt. # 44-2, Exhibit 1, at 120.  Barley also claims that two female co-workers continued "talking [amongst themselves] about [her] and [Watson] and what went on."  <u>Id.</u> at 119.  Barley alleges that these two employees "were basically calling [her] a slut and everything else."  <u>Id.</u>  Barley did not report any of this alleged misconduct to management.  Dkt. # 55-2, Exhibit 3, at 120, 154-57.

At the conclusion of the formal Redbook investigation, Smith made determinations of fact as to the reported misconduct.  Among other things, Smith found that the alleged threesome proposition by Watson to Barley could not be substantiated.  <u>Id.</u> at 14.  Smith noted that two witnesses stated that Barley liked Watson, and that they believed she was lying.  <u>Id.</u>  Smith found

---

[2]  Another deli associate corroborated Watson's claim.  The associate stated that she told Watson that Barley "was trouble" and recommended that he stop talking to her.  <u>Id.</u> at 14. She claimed that Barley liked Watson, but that he was not interested in her and Barley could not handle the rejection.  <u>Id.</u>  During her interview, the associate confirmed that she had heard of the rumored threesome among Watson, Barley, and Dawes, but that she had not heard the rumor from Watson.  <u>Id.</u>  She stated that she did not witness inappropriate touching or conversations between Watson and Barley.  <u>Id.</u>  The associate also believed that Barley lied and that her accusations about Watson were untrue.  <u>Id.</u>

that while Watson did ask Dawes about the threesome rumor, he did so only to discover the rumor's source.  Id.  Smith believed the investigation revealed that Barley actually started the threesome rumor.  Id. at 14-15.  Smith testified that he arrived at this conclusion after reviewing all of the interviews and witness statements.  Id. at 15.  Smith further testified that he sought to conduct a fair and impartial investigation and to arrive at accurate conclusions.  Id.

After completing the Redbook investigation, Smith reprimanded Watson, Barley, and Henderson for their "inappropriate conduct."  Id.  Smith found that Watson and Barley had been active participants in discussing and spreading the sexually-related gossip and rumors.  Id.  Smith also found that Henderson had made inappropriate comments to Jackson.  Id.  Smith gave Watson and Henderson a written warning, the second step in the "Coaching for Improvement" process.[3]  Id. Smith terminated Barley, however, because she had an active "Decision-Making Day" status at the time he completed the investigation.[4]  Id.

Barley testified that she told Smith at her exit interview that "he was wrong . . . for terminating [her] when [she] came to him for help."  Dkt. # 44-2, Exhibit 1, at 123.  Barley claims that Smith did not tell her the names of the other individuals he interviewed or inform her about his specific conclusions.  Dkt. # 44, at 19.  Barley claims that he simply told her that she and others

---

[3]     Smith elected to bypass the first step, a verbal warning, because of the seriousness of Watson's and Henderson's conduct.  Id.

[4]     Barley was under an active "Decision-Making Day" status for prior violations of company policy.  Id. at 7.  Barley received a verbal reprimand on January 15, 2004 for violating company dress code and for excessively using her cell phone.  Id.  Barley received a written reprimand on April 17, 2004 for violating the attendance policy.  Id.  Barley later received a "Decision-Making Day" reprimand for attendance and punctuality violations.  Id.  Barley testified that she did not disagree with these reprimands.  Id.  Smith testified that he was unaware of these prior reprimands when he made his disciplinary decision.  See Dkt. # 35, at 16.

were guilty of gossip.  Id.  Nevertheless, Barley also testified that she believed Smith and Stewart were fair and reasonable managers.  Id. at 5-6.  Barley considered them individuals to whom she could bring her employment-related issues and concerns.  Id. at 5-6.

Smith testified that he felt compelled to issue Barley a reprimand, notwithstanding the resulting termination, because company policy had to be consistently applied to serious and disruptive conduct.  Dkt. # 35, Ex. 3, at 99.  Smith testified that Barley's gender and the filing of her grievance had nothing to do with his decision.  Dkt. # 44, at 16.  Smith characterized Barley as "delightful, very easy going, polite [and] . . . nice . . . ."  Dkt. # 44-14, Exhibit 14, at 91.  Having interacted with Barley on a weekly basis, Smith testified that he "had no reason to believe when [he] started this [investigation] that she would make things up . . . ."  Dkt. # 44-14, Exhibit 1, at 155.

After her June 7, 2005 termination, Barley filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sexual harassment and retaliation.[5]  Dkt. # 44, at 16.  On January 24, 2007, the EEOC closed its investigation of Barley's case and issued her

---

[5]    While Barley alleged other improper conduct beyond Watson's sexual comments in her EEOC proceeding, including inappropriate physical contact by Watson, Barley admits that the only harassment she reported to Wal-Mart management concerned Watson's comments. Dkt. # 44, at 23.  Barley states that "[b]ecause of th[is] admission, coupled with the fact that Plaintiff admits no one in authority at Wal-Mart witnessed any of the earlier alleged conduct by Watson, Barley cannot seek to establish vicarious liability based upon those prior acts." Dkt. # 44, at 23.  Therefore, the Court need not consider any improper acts other than those reported to Wal-Mart beginning on or about May 30, 2005.

a right to sue letter.[6] Dkt. # 35, Exhibit 16.  Barley filed the instant civil action in this Court on April

25, 2007.  Wal-Mart now moves for summary judgment pursuant to Fed. R. Civ. P. 56.

## II.

Summary judgment pursuant to Rule 56 is appropriate where no genuine issue of material

fact exists, and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall

v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of Rule 56(c) mandates the

entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 317.

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just,

speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the

---

[6]     Barley also references an Oklahoma Employment Security Commission ("OESC") Order
relating to her claim for unemployment compensation.  See Dkt. # 44, at 16-17.  OESC
proceedings, orders and rulings are not admissible, however.  See OKLA. STAT. tit. 40, § 2-
610.1 ("Any findings of fact or law, judgment, conclusion or final order made by the OESC,
its referees, the Appeal Tribunal or Board of Review in an unemployment insurance
proceeding[,] shall not be conclusive or binding in any separate or subsequent action or
proceeding, and shall not be used as evidence in any separate or subsequent action or
proceeding . . . ."); see also Wessell v. Enersys, Inc., No. 03-4089-SAC, 2005 WL 1863098,
at *2 (D. Kan. July 6, 2005) ("Federal courts consistently have treated Kansas
unemployment insurance proceedings as so unique and different from other judicial
proceedings that collateral estoppel effect was not accorded them.").  Thus, the Court need
not consider Barley's reference to the OESC proceedings.

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

Title VII makes it unlawful for an "employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  Pursuant to Title VII, Barley brings a hostile work environment claim and a retaliation claim against Wal-Mart.  Wal-Mart argues that Barley's hostile work environment claim fails as a matter of law because Barley cannot show severe or pervasive harassment.  See Dkt. # 35, at 17-19.  Wal-Mart argues that, even if Barley could show severe or pervasive harassment, Wal-Mart would not be liable for Watson's alleged inappropriate conduct. See id. at 20-21. Wal-Mart submits that Barley has no evidence of Wal-Mart's actual or constructive knowledge of such inappropriate conduct prior to her report.  See id. at 20-21.  Finally, Wal-Mart argues that Barley's retaliation claim fails because Barley has presented no evidence that her termination was motivated by retaliatory animus or that Wal-Mart's justification for her termination

is pretextual.  See id. at 24-25.  Part A addresses the hostile work environment claim; Part B addresses retaliation.

## A.

Although Title VII does not specifically use the term "hostile work environment," it is well established that a victim of a sexually hostile work environment may bring a claim under Title VII. For sexual harassment to be actionable under Title VII, a plaintiff must establish that "(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.'" Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1263 (10th Cir. 2005) (internal quotation marks and citation omitted) (alteration in original); see Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (citation omitted); Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1537 (10th Cir. 1995).  Here, only the fourth element appears to be is disputed.

### 1.  Severe or Pervasive Harassment

To satisfy the fourth element, a plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998).  A plaintiff "must present 'admissible evidence that she was subjected to a steady barrage of opprobrious [sexual] comments.'" Bolin v. Okla. Conference of the United Methodist Church, 397 F. Supp. 2d 1293, 1302 (N.D. Okla. 2005) (quoting Gross, 53 F.3d at 1543) (alteration in original).  "The mere utterance of a statement which engendered offensive feelings in an employee [does] not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." Gross, 53 F.3d at 1537 (quoting Meritor, 477

10

U.S. at 67) (internal quotations omitted).  In determining whether the alleged sexual harassment rises

to this actionable level, courts must examine the totality of circumstances, which may include "the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

employee's work performance such as the nature of the sexual advances and the context in which

the alleged incidents occurred." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993).

> A hostile work environment claim entails both objective and subjective components:
>
> Conduct that is not severe or pervasive enough to create an objectively hostile or
> abusive work environment – an environment that a reasonable person would find
> hostile or abusive – is beyond Title VII's purview.  Likewise, if the victim does not
> subjectively perceive the environment to be abusive, the conduct has not actually
> altered the conditions of the victim's employment, and there is no Title VII violation.

<u>Harris</u>, 510 U.S. at 21.  While a plaintiff must show that the environment was both objectively and

subjectively hostile, she need not demonstrate psychological harm.  <u>Id.</u> at 20.

Here, Barley claims that Watson's inappropriate sexual comments contributed to a hostile

work environment.  Barley reported to Wal-Mart management on or about May 30, 2005 that,

approximately three months earlier, Watson asked if she wanted to engage in a threesome with him

and Dawes.[7]  She also reported that in April and May 2005, Watson and other associates spread the

rumor about this threesome.  Barley claims that she verbally informed Stewart about Watson's other

inappropriate comments at the time of their initial meeting.  This is the only conduct Barley reported

to Wal-Mart management.

_____

[7]    The Court notes, <u>sua sponte</u>, that Barley did not return from her leave of absence until April
5, 2005, one month after Watson allegedly approached Barley about a threesome.

Even if this Court accepts all of Barley's assertions as true, Watson's alleged conduct does not qualify as "severe or pervasive enough to create an objectively hostile or abusive work environment." Harris, 510 U.S. at 21. For example, contrary to the facts in Davis, 142 F.3d at 1341, Barley was not "subjected to regular unwelcome hugging and kissing combined with" other sexual touching and comments. Barley's treatment, although ostensibly less severe, is much more akin to the circumstances in Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1366 (10th Cir. 1997). In Sprague, the court affirmed summary judgment in favor of the employer. Id. The court found that the alleged inappropriate conduct – which included a co-worker putting his arm around the plaintiff, looking down her dress and saying "you got to get when you can," asking the plaintiff to undo the top button of her blouse, referring to her breasts as "girls," commenting that "neck chains" sounded "kinky," and remarking about pre-menstrual women – was not severe or pervasive enough to alter the terms and conditions of employment.[8]  Id.  The alleged inappropriate conduct in this case consists of: (i) Watson's threesome inquiry, (ii) Watson's expressions of his sexual desire for Barley, (iii) Watson's spreading of the threesome rumor to co-workers, and (iv) two female co-workers' gossip and name-calling among themselves. The Court finds that Barley has not submitted evidence "revealing an environment polluted with gender-specific comments and behavior that exceeded the mere flirtatiousness or baseness that has been found not to support a Title VII claim." Harsco Corp. v. Renner, 475 F.3d 1179, 1188 (10th Cir. 2007) (distinguishing cases in which the Tenth Circuit affirmed summary judgment in defendants' favor).

---

[8]     Even in E.E.O.C. v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir. 2007), a factually distinguishable case in which the Circuit affirmed denial of summary judgment, the Circuit noted that "a few isolated incidents of gender animus does [sic] not establish a pervasively hostile work environment."

Further, under the totality of the circumstances, the Court questions whether Barley herself perceived the environment to be abusive.  Barley failed to timely report the alleged conduct despite her knowledge of Wal-Mart's "open door" and anti-discrimination policies.  See Holmes v. Utah, Dep't of Workforce Servs., 483 F.3d 1057, 1064 (10th Cir. 2007) (holding that a plaintiff's failure to timely or fully report alleged harassment raises doubts as to whether the plaintiff perceived the conduct as harassing).  Barley willingly continued to work around Watson for months after Watson's alleged harassment.

In sum, Title VII is not a "general civility code."  Faragher, 524 U.S. at 788.  The Tenth Circuit has held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  Id. (internal citation and quotation marks omitted).  No rational jury could find that Barley's workplace was permeated with discriminatory intimidation, ridicule, and insult based on the record before the Court.  Davis, 142 F.3d at 1341.  Thus, while this Court certainly does not condone Watson's alleged behavior, it cannot find that Barley has raised a genuine issue of material fact as her hostile work environment claim.

### 2.  Employer Liability

Further, even if Barley could present evidence of severe, pervasive harassment by Watson, the Court finds that her claim nonetheless fails as a matter of law.  "To survive summary judgment under Title VII, the record must support an inference of a [] hostile work environment and a basis for employer liability."  Ford v. West, 222 F.3d 767, 775 (10th Cir. 2000) (emphasis in original).  A plaintiff must prove that: (1) the harassment occurred within the scope of the transgressor's employment; (2) the employer had actual or constructive knowledge of the hostile work environment

13

and failed to respond in a reasonable manner; or (3) the transgressor acted with the apparent authority of the employer.  Id. at 775-76.  Here, Barley alleges that Wal-Mart is liable for its failure to remedy and to prevent a hostile work environment after it had notice of Watson's behavior. Barley claims that Wal-Mart should have placed Watson on suspension pending the investigation instead of merely moving him to another section of the store.  See Dkt. # 44, at 23.  According to Barley, Wal-Mart is negligent because its remedial action did not end the harassment.  See id.

In determining employer liability for failing to remedy and prevent harassment, courts must make two inquiries.  First, courts must examine whether the employer had actual or constructive knowledge of the harassment.  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 673 (10th Cir. 1998). Second, courts must examine whether the employer's response to any actually or constructively known harassment was adequate.  Id.  The employer's response qualifies as adequate if it is reasonable.  Id. at 675-76 ("[T]he touchstone for evaluation of an employer's response . . . is reasonableness.")

The Court finds no basis to impose liability on Wal-Mart for Watson's alleged harassment of Barley.  Barley's sole argument for imposing liability on Wal-Mart is that "it failed to respond in a manner reasonably calculated to end the harassment" because its chosen course of "action did not end the harassment."  Dkt. # 44, at 23.  Contrary to Barley's assertion, the reasonableness of the employer's response is not judged solely by the outcome.[9]  While a "stoppage of harassment" does,

---

[9]     The Court notes, moreover, that had Wal-Mart immediately suspended Watson without first investigating Barley's complaint, Wal-Mart could have faced a claim by Watson that it acted precipitously and unlawfully.  See e.g., Scarborough v. ExxonMobil Corp., 328 F.3d 1255, 1262 (10th Cir. 2003) ("If we required employers to impose discipline without investigation or to impose excessive discipline, employers would invariably face claims from the other direction of violations of due process rights and wrongful termination." (internal quotation marks and citation omitted)).

in fact, evidence reasonableness, "this is not the sole factor to be considered." Adler, 144 F.3d at 676. The employer's response may be "reasonably calculated to end the harassment" notwithstanding the transgressor's persistence. Id. The Tenth Circuit has held that, in addition to "stoppage," a court must consider the following elements in evaluating the reasonableness of the response: (1) the timeliness of the plaintiff's complaint, (2) whether the employer's response was unduly delayed, and (3) "whether the response was proportional to the seriousness and frequency of the harassment." Id.

The Court finds that Wal-Mart promptly responded to Barley's complaint of sexual harassment. The record reveals that as soon as Barley reported the matter to Robertson, he reported it to Stewart. Stewart then promptly transferred Watson from the deli to another section of the store pending the investigation. Stewart conducted an initial investigation and relayed his findings to Smith, who in turn opened a formal Redbook investigation. Witnesses were interviewed, written statements were taken, and reprimands were issued all within one week. The Court finds that a one week response time, under these circumstances, certainly does not qualify as unduly delayed or disproportionate to the seriousness and frequency of the alleged misconduct. See id. ("[R]esponses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination."). Further, the Tenth Circuit does not require substantiation of Barley's complaint for Wal-Mart's response to qualify as reasonable. See e.g., Duncan v. Manager, Dep't of Safety, City and County of Denver, 397 F.3d 1300, 1313 (10th Cir.

2005) ("Even if [the plaintiff]'s allegations were true, we cannot say the defendant failed to exercise due diligence in responding to her [] complaint.").

As to the alleged harassment that occurred after Barley filed her grievance, an employer is not liable as long as it reasonably acts – and once apprised of additional conduct – takes appropriate remedial action. Adler, 144 F.3d at 677. There is no evidence that Wal-Mart had reason to believe that Watson's alleged harassment persisted, or that two associates were gossiping among themselves and calling Barley names like "slut." Wal-Mart never had an opportunity to address this inappropriate behavior, moreover, because Barley did not reported it. The Court concludes, therefore, that Wal-Mart's response to Barley's allegations was reasonable. Summary judgment for Wal-Mart is appropriate as to Barley's sexual harassment claim.

## B.

Barley claims that Wal-Mart unlawfully terminated her in retaliation for reporting Watson's alleged sexual harassment. Title VII provides that an employer may not lawfully take any adverse action against an employee for filing a charge or reporting acts of alleged workplace discrimination. 42 U.S.C. § 2000e-3(a). "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224-25 (10th Cir. 2008). Under the "mixed-motive" theory, a plaintiff may directly show that retaliatory animus at least partially motivated the adverse employment action. Id. at 1225. If, however, the plaintiff is unable to directly show that retaliation was a motivating factor, the plaintiff may rely on the McDonnell Douglas framework to prove that the employer's proffered reason for its action is a pretext for retaliation. Id. The plaintiff may argue one or both theories. See id. Here, Barley argues both mixed-motive and pretext.

16

## 1.  Mixed-Motive Theory

Under the mixed-motive theory, the plaintiff first must prove that retaliatory animus was a motivating factor in the employer's decision.  Id.  The plaintiff can directly establish retaliatory motivation through the use of direct and circumstantial evidence.[10]  Id. at 1226.  If the plaintiff proffers circumstantial evidence of motive, however, the evidence must relate 'to a [retaliatory] reason for the employer's action.'"  Id. at 1226-27 (quoting Sartor v. Spherion Corp., 388 F.3d 275, 278 (7th Cir. 2004) (alteration in original)).  Once the plaintiff proves that retaliatory animus played a role in the employer's decision, the burden of persuasion shifts to the employer to prove that "it would have taken the same action absent the retaliatory motive."  Fye, 516 F.3d at 1225.

The Court finds that Barley cannot satisfy her burden under the mixed-motive theory.  Barley's response appears to offer as circumstantial evidence of discriminatory motive the fact that "Smith would have never been aware of any of the facts leading to [Barley's] termination, but for her own complaint about Watson's inappropriate behavior."  Dkt. # 44, at 25.  This fact does not relate to a retaliatory motive, however.  While Barley's report of Watson's conduct may have been the "but-for cause" of her ultimate termination, Barley proffers nothing more than this general causation theory in support of her claim.  Barley does not offer direct testimony or express statements by management that Smith issued the reprimands, at least in part, because she reported sexual harassment.  See Fye, 516 F.3d at 1227 (describing the type of evidence that a plaintiff must proffer to show retaliatory motive).  In sum, Barley's but-for theory fails because it does not

---

[10]     Direct evidence is evidence that if believed proves the existence of a fact without inference or presumption.  Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1117 (10th Cir. 2007).  Circumstantial evidence, on the other hand, is evidence that requires the factfinder to make an inference or presumption in establishing the existence of a fact.  See generally Fye, 516 F.3d at 1226.

"contain verbiage from which a reasonable inference of . . . retaliatory animus[] may be drawn." Id. (internal quotation marks omitted) (alterations in original). Thus, Barley cannot satisfy her burden under the mixed-motive theory.

## 2. McDonnell Douglas Framework

Because Barley proffers no evidence directly showing mixed motive, she must satisfy the McDonnell Douglas framework. Under this framework, a plaintiff must first establish a prima facie case of retaliation by showing that: (1) she engaged in protected opposition to discrimination; (2) her employer took an adverse employment action against her; and (3) there is a causal connection between the opposition and the adverse action. Stover v. Martinez, 382 F.3d 1064, 1071 (10th Cir. 2004). If the plaintiff establishes her prima facie case, the burden shifts to the employer to demonstrate a legitimate, non-retaliatory reason for her termination. Fye, 516 F.3d at 1227. Once the employer produces a legitimate, nondiscriminatory reason, the burden returns to the plaintiff to establish that the employer's proffered reason for her termination is pretextual. Id.

The Court need not address the first or second steps in the burden-shifting scheme. Wal-Mart concedes for the purposes of summary judgment only that Barley can establish a prima facie case of retaliatory termination. Dkt. # 35, at 23. Similarly, Barley concedes that Wal-Mart has produced a legitimate, non-retaliatory reason for its adverse employment action. Dkt. # 44, at 26. Thus, the Court begins with its analysis of pretext.

To show pretext, a plaintiff must produce evidence that would, if believed by the trier of fact, show that the true reason for the action was discriminatory. The plaintiff may produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally

18

find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Fye, 516 F.3d at 1228 (internal quotation marks and citation omitted).  The Tenth Circuit has made clear that courts "must assess pretext by examining the facts as they appear[ed] to the person making the decision to terminate."  Tesh v. U.S. Postal Serv., 349 F.3d 1270, 1273 (10th Cir. 2003).  The question is not whether the employer's stated reason for the plaintiff's termination was factually accurate, but whether the employer "reasonably 'perceived' that it was accurate."  Id. (citation omitted); see McKnight v. Kimberly-Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.").  In sum, courts have a duty "to prevent unlawful hiring practices, not to act as [] 'super personnel department[s]' that second guess[] employers' business judgments." Simms v. Okla. ex rel. Dep't of Mental Health and  Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999) (citation omitted).

Barley offers the following "facts" as circumstantial evidence of pretext: (1) Despite Smith's claim to the contrary, he knew of Barley's prior reprimands before he made his termination decision; (2) Smith failed to question Dawes about what knowledge she had about Barley's allegations about Watson; (3) Smith credited some witness statements more than others; (4) Smith disregarded the witness statement of a produce associate, who stated that Watson told a deli associate that this produce associate started the threesome rumor, see Dkt. # 44-17, Exhibit 17, at 3; (5) Smith failed to interview a deli associate identified as a person with potential knowledge of the matter; (6) Smith's findings with regard to Barley contradicted his description of Barley as "delightful, very easy going, polite [and] . . . nice," Dkt. # 44-14, Exhibit 14, at 91; and (7) Smith failed to investigate

the "issue of whether Watson engaged in sexually inappropriate behavior toward Barley," Dkt. # 44, at 29.

The Court finds that Barley has presented no evidence showing that Wal-Mart's reason for terminating Barley is pretextual.  First, whether Smith knew of Barley's prior reprimands before disciplining Watson, Henderson, and Barley is irrelevant.  Piercy v. Maketa, 480 F.3d 1192, 1201 (10th Cir. 2007) ("[C]onflicting evidence only affects summary judgment if it is relevant to the inquiry."). The fact that Smith, the store manager, did not recall Barley's "Decision-Making Day" status at the time of his investigation does not raise a genuine issue of material fact.  Smith testified that he felt compelled to issue Barley a reprimand, notwithstanding the resulting termination, because company policy had to be consistently applied to serious and disruptive conduct.  Moreover, Barley cannot raise a genuine issue of material fact by claiming that Smith was wrong about the facts, should have investigated further, mistakenly came to one conclusion over another, or made a poor or ill-advised business decision.[11]  This Court does not find glaring contradictions in Wal-Mart's proffered justification for its action, or implausibilities or inconsistencies in its story, to support an inference of pretext.

Further, the Court finds that there is no evidence suggesting that Smith did not honestly believe his factual findings.  Barley, herself, even testified that Smith and Stewart were fair and reasonable managers.  Dkt. # 44, at 5-6.  Barley also considered them individuals to whom she could bring her employment-related issues and concerns.  Id. at 5-6.  No evidence exists suggesting that

---

[11]     Further, Barley incorrectly contends that Smith failed to investigate whether Watson engaged in sexually inappropriate behavior.  The record clearly reveals that nearly all of the Redbook investigation focused on Barley's reported allegations. Perhaps this fact explains why Barley does not support her assertion with even one citation to the record.

Smith had a bias against Barley, or that he issued the reprimands as part of a scheme to conceal retaliatory animus.  In fact, Smith characterized Barley as "delightful, very easy going, polite [and] . . . nice," Dkt. # 44-14, Exhibit 14, at 91, and admitted that he "had no reason to believe when [he] started this [investigation] that she would make things up," Dkt. # 44-14, Exhibit 1, at 155. Similarly, there is no evidence that Smith did not follow company guidelines when conducting his formal Redbook investigation.  Neither Barley nor this Court may, with the benefit of hindsight, secondguess Smith's decisions about whom to interview, what questions to ask, how to weigh the evidence, or what conclusions to make.  Smith was entitled to exercise his business judgment.  The Court concludes, therefore, that Barley's claim of retaliation fails.

**IT IS THEREFORE ORDERED** that Defendant's Motion Summary [sic] Judgment and Supporting Brief  (Dkt. # 35) is hereby **granted**.  A separate judgment is entered herewith.

**DATED** this 10th day of April, 2008.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT